# Irene Oles *v.* The Pittsburg Times, Appellant.

*Libel defined—Right to damages—Advances.*

Any malicious publication, written, printed or painted, which by words or signs, tends to expose a person to contempt, ridicule, hatred or degradation of character is a libel; and the person libeled may recover damages, unless it be shown that the publication was true or was justifiably made.

*Libel—Witchcraft—Question for jury.*

Charging witchcraft is no longer libel per se; but it is entirely proper to leave it as a question for the jury whether being called a witch would be calculated to injure the reputation and standing in society of the plaintiff there being evidence to warrant the jury in finding the following facts: (1) Belief in witchcraft in the community where plaintff lived and defendant's paper circulated; (2) tendency of the publication to encourage this belief.

*Libel—Truth of libel as a defense.*

Where there is no confidential relation, no existing duty and no common interest every repetition of a slander is a wilful publication of it. A newspaper report may be none the less libelous because it is a truthful recital of what was believed and asserted by others; the truth of an allegation against another is a complete defense in a civil suit, but it must be the truth of the fact alleged and not the truth that somebody told the author that it was so.

*Libel—Newspapers — Privileged communication—Legitimate news and prurient and sensational reports distinguished.*

Newspaper articles or reports which do not deal in matters of legitimate news of which it is the interest of the public to be informed, except that which arises out of idle curiosity and vitiated appetite for the prurient and sensational, are not privileged communications.

A newspaper reported and published neighborhood gossip and slander charging plaintiff with being a witch. The plaintiff was a harmless old woman whose livelihood depended on the good will and good opinion of the people in the community in which she lived. Instead of the occasion being one which made the publication proper for public investigation and information, the very fact that a few superstitious persons entertained the false and unfounded belief that she was a witch ought to have shielded her against a more extensive circulation of the injurious rumor by those who must have known that it was not founded on truth.

Argued April 7, 1896. Appeal, No. 31, April T., 1896, by defendant, from judgment of C. P. No. 1, Allegheny County, June Term, 1894, No. 683, on verdict for plaintiff. Before

RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Affirmed.

Trespass for libel. Before STOWE, P. J. Verdict for plaintiff for $600.

On December 4, 1893, the Pittsburg Times, a daily newspaper published in the city of Pittsburg, received and published the following article from its correspondent at Washington, Pa.:

EXCITEMENT OVER ALLEGED WITCHCRAFT AT WASHINGTON.

*The parents of a little boy and the neighbors attribute what the doctors pronounce a nervous malady to the evil influence of an old woman.*

WASHINGTON, Pa., Dec. 3.—West Washington is greatly excited over the strange case of 12-year-old John Newman, son of Henry Newman, who for a week has been affected by an ailment which many of the neighbors stoutly claim is witchcraft.

The boy was sitting in a chair last Sunday at his home when his head fell forward on his breast and he pitched to the floor. No one was about the house but the mother and younger children, and by the time the neighbors were summoned he was found to be in spasms. Later he frothed at the mouth and barked like a dog. Dr. J. B. Irwin was called and rendered what aid was in his power, and has since called Dr. Wray Grayson in consultation on the case.

The Times correspondent visited the Newman home this afternoon, but found the blinds tightly drawn and received no response to repeated knocks. The nearest neighbors told a story of superstition almost incredible regarding the boy's parents. The Newman family, as well as many neighbors, believe the boy is possessed of devils, and that an old woman who resides on Cherry alley, this place, named Oles, is responsible for his peculiar behavior.

The Newmans will receive no strangers in their home and no one at all after the sun goes down. This they believe to be required of them by the witches. Mrs. Charles Ring who resides opposite, shares the belief of the Newmans and thinks the boy is laboring under a strange spell brought on by contact with Mrs. Oles. The last named peddles medicine and often visited the Newman home.

**132**     OLES *v.* PITTSBURG TIMES, Appellant.

Statement of Facts—Charge of Court.     [2 Super. Ct.

Mrs. Ring says she visited a witch woman in Pittsburg Tuesday and received instructions how to treat the boy. She said they could not tell for nine days what the treatment would bring forth. She further said that a wild looking colored man had been seen in consultation with Mrs. Oles.

Mr. and Mrs. Ring lately moved here from Pittsburg.

The parents of the boy live in a very modest one story frame house, the father working in a stone quarry.

Dr. Irwin says the boy's trouble is of a nervous nature, but that he was undoubtedly greatly frightened by the old woman.

It also appeared from the record and evidence that:

Upon this article, as published, the plaintiff, Irene Oles, brought an action for libel against The Times, alleging that said article was false, scandalous, illegal and defamatory, intended to hold her up to public ridicule and reproach, and to deprive her of her means of livelihood.

Plaintiff was an old woman, and in a small way a peddler of herbs and homemade remedies among the poorer classes of the people of Washington. West Washington, the scene of the events related in the article, is a newer portion of the borough of Washington, and the people are for the most part of the less intelligent laboring class. The article on its face is but a plain recital of events which actually transpired in this community, and in which as defendant alleged the public had an interest.

The substantial, indeed almost literal truth, of every statement in the article as published, so far as it related events and declarations, was not seriously controverted upon the trial of the case.

The court below, STOWE, P. J., charged the jury as follows:

Gentlemen of the Jury: The plaintiff's claim in this case is founded upon an alleged injury done her by the publication in the Pittsburg Times, which has been given in evidence and which is alleged to be a libel, in legal terms. A libel, as you heard stated, is any publication, either by signs, printing or otherwise, that is calculated to bring upon anybody public odium or contempt, or which is likely to injure them in their standing in society, in general terms.

The allegation in this case is that this article imputes to the plaintiff, or insinuates or indicates to the person reading it that

the plaintiff is what they used to call (and do call still, apparently, to my utter astonishment) a witch; that is to say, one who by direct communication, spiritual or physical, as it may be, with the devil, has a power to exercise an evil influence over other human beings.

At one time it was the general belief that there were such things as witches, and the history of that matter is a very amusing one, apart from the tragedy connected with it in many cases. Amusing to us now, but a very serious matter in its time.   It is said that at common law in England, to be a witch, assuming that there were such things, was a felony.   In 1675, I think it was, all previous statutes (there having been some before that) were repealed, and then it was made a felony punishable by death.   To be a witch was a capital offense, and even so great a judge as Judge HALE, who was looked upon as one of the most merciful criminal judges, and the most learned that ever sat upon the bench up to this day, sentenced a woman to be hanged for the crime of witchcraft.   And the most singular thing connected with the whole matter is that upon the scaffold, or drop, she actually admitted, as many of them did, that she had been guilty of witchcraft.   But by degrees, when people became more intelligent and enlightened, that belief passed away, and in 1755, or 1756, an act of parliament was passed in England abolishing the offense.   I believe those are the dates.   They are near enough for the present purposes.   The book under the head of witchcraft, defines the meaning, as understood at that time, of the terms conjurers, witches, sorcerers or charmers, as persons who shall use, practice or exercise any witchcraft, sorcery, charm or enchantment, or who shall use, practice or exercise any invocation or conjuration of any evil or wicked spirit.   It is further said : " That belief in the thing called witchcraft having become obsolete it is now no longer an offense."

During the trial of this case it would strike me that if the author had been here he would have come to the conclusion that the belief in witchcraft hardly had ceased to exist.   Probably most of you know that even in this country in Massachusetts, staid and sober old Massachusetts, more that one person was put to death for the crime of witchcraft.

But it is no longer a criminal offense, and therefore to charge one with witchcraft is not what we call per se a libel.  To

charge one with a criminal offense is a libel in itself, and it does not make any difference, so far as the case is concerned, whether there was any actual or specific damage done or not. It is not for the jury, it is a matter of law for the court; it is the duty of the court to say where a charge is made of a criminal offense that it is libelous per se; and unless there is something by way of justification, it is the duty of the jury, if an action is brought, to give the plaintiff damages.

But this case, standing as it does now, the charge not being of a criminal offense, is not a matter of law for the court, but a matter for the jury to determine whether, under all the circumstances of the case, the imputation or suggestion or statement, if such there is by the fair and natural construction of this paper, that one is a witch is calculated to injure the reputation or standing or safety or business of a party so charged in society. If it is, then it is a libel because it is a publication the natural tendency of which is to injure and affect the reputation of another, and whenever a publication of that sort is made without some legal excuse shown for it—as I may say, by way of parenthesis, none is shown in this case—then it is a libel, and the plaintiff is entitled to recover damages.

What the natural construction of this article is is for you. You have heard it discussed. You take it with you and read it. What is the imputation suggested?

What would anybody believe from reading that article? Does it impute or charge this woman with being a witch? Is that such a construction or inference or conclusion as any ordinarily reasonable man would draw from that paper? If not, if there is nothing of that kind to be inferred, then, of course, the plaintiff has made out no case. But if that is the natural and fair construction of the article (and that is a matter for you, as I said before), then it is libelous, if to call one a witch in plain terms would be calculated to injure his reputation or standing in society.

Now, when you come to that you have got to take the world as you find it, and people who publish newspapers have got to take the people as they know them, or are bound to know them to be. If this was an article read in some society of learned men who did not believe in such things as witchcraft, or that there were such things as witches, probably it would have no

effect at all; they would not believe it, and therefore it would do no harm. But you have heard the testimony, and you have your own knowledge on that point—a knowledge of the superstitions of the masses of the people, and if with that knowledge you are led to believe that being called a witch would be calculated to injure the reputation of another and injure his standing in society, then it becomes libelous and becomes the foundation for damages.

As I said before, in considering that question you are not to treat it as you might have believed, you having no belief at all in witches; but you must consider it as you find a large number of people do believe, for you know very well that the days of superstition have not passed, and perhaps never will pass. There are plenty of people nowadays, and very intelligent people, too, who have superstitions of various kinds. I know some people whom I think very intelligent people who will not pass under a ladder that is standing against the side of a house. Well, I should not if I saw a man up there with a bucket of paint. That is not their fear, however; it is bad luck. Somebody upsets a saltcellar—I have seen it with many people at the table —the saltcellar picked up and some salt thrown over the shoulder; and a dozen other trifling things of that kind, that while the people do not really believe in them, yet there is some sort of apprehension or fear that there are certain things that produce or lead to some evil influence, or connected with them so as to be unlucky or unfortunate in bringing about things of that kind. The world is full of them, and particularly so of those who, like some of us, can trace a little Irish ancestry in our veins. I do not mean to find any fault with that kind of blood—I have some myself.

Those are the ideas I wish to offer as suggestions with reference to the imputation of this article. [Was it such an article as naturally would create the impression that this woman was supposed to be, or was stated by her neighbors and these people about Washington to be, a witch? There is no pretense that she is a witch; that idea is absurd. The fact that these men who published this article were informed so is no sort of excuse if this imputation of being a witch would be naturally calculated to injure, whether intended or not, the reputation and the business and standing of the plaintiff in this case. I want to put

this certainly upon the record. If a man charges another, upon hearsay, with a serious offense, which if true would injure his reputation in society, if he gets the statement from somebody else it is no defense, and he cannot undertake to escape by saying that somebody else told him it was so and that he believed it. If such was the law no man would be safe.] [3] All you or I, or anybody that had a disposition to ruin a neighbor, would have to do would be to go and tell some one that such a man had committed an offense, from assault and battery to the most serious offense, and have it published broadcast throughout the country; then when the paper—we being unknown—was sued, for them to prove that you or I had said it would be no defense. If that were so a man could stab another in the dark, until the only remedy would not be law but would be some other way of settling people who published articles of that kind. The fact is that the very basis of the criminal prosecution for libel is the tendency of the libel to produce a breach of the peace. But in the civil side of the court it is different. [It is true the truth of an allegation against another is a complete defense in a civil suit, but it must be the truth of the fact alleged, and not the truth that somebody told the author that it was so.] [3]

We have been asked to say to you by defendant:

1. If the jury finds that the publication complained of is a substantially fair and true account of the matter therein referred to, plaintiff cannot recover and the verdict must be for defendant. *Answer:* Refused. That simply means if the jury believes from the testimony that the statement was true, the fact, in other words, that the reporters got the substantial statement from somebody, and that the article merely told the truth, so far as their information was concerned, that it had been given to them in the manner in which it states, that it would be a defense in this case. As I said before, that is no defense. To make out a justification, whatever the charge is, the evidence must show that the charge is true, and the party cannot escape by proving that somebody else told him that it was true, and that he believed it. To make it a defense it must be supplemented by the fact that it was actually true. To illustrate: If any one would say of one of you gentlemen that you had committed a criminal offense, and the reporter would publish that in the newspaper, stating they had been informed you had com-

mitted a criminal offense and stating what it was, and you would sue them for libel, it would be no defense to prove that the party had said to this reporter or the party who published it that you were guilty of a criminal offense. That would go to the jury in one shape by way of mitigation of damages; but to be a complete defense it must be proven you were actually guilty of the offense alleged. [1]

We are asked on the part of the plaintiff to say to you:

1. The publication complained of in this case, tending of itself to expose the plaintiff to hatred, contempt, ridicule or obloquy, to injure her in obtaining a livelihood in her occupation as a nurse and to cause her to be shunned or avoided by her neighbors and by those from whom she might otherwise have employment, is in law a malicious libel; and the plaintiff may recover damages unless the jury find that the publication was true, or unless it was privileged. *Answer:* Whether the article referred to is such as naturally tended to expose plaintiff to hatred, contempt or obloquy, or to injure her as stated in this point, is for the jury, and if they so find, it is a libel. This fact is for the jury to determine under the evidence in the case; but as a whole the point is refused. It asks us to say as matter of law that this is a libel. We decline to say it is a libel, but refer it to you to say what is the natural meaning and signification of this article, and whether its tendency is such as would naturally bring about injury, such as is complained of in this case. If you find that it is a libel and its natural effect was to injure the plaintiff, that gives the plaintiff a right to damages of some sort and to some extent.

2. The malice that is an essential of an actionable libel, is simply malice in the legal sense, which exists where there is no lawful excuse for the publication, and though there may be no spite or ill will or disposition to injure by it. Therefore, the words of the article complained of being actionable of themselves, the defendant must be taken to have intended the injurious consequences naturally and approximately resulting therefrom, and be held responsible therefor, even in the absence of any intent to injure the plaintiff. *Answer:* Refused. Whether the article is actionable or not depends upon what the jury may find its natural effect upon the plaintiff as stated in answer to the foregoing point may be; we cannot say as a mere

conclusion of law that the article is libelous. And upon that point it is just as well to say what our own Supreme Court has said: " Any malicious publication, written, printed or painted, which by words or signs tend to expose a person to contempt, ridicule, hatred or degradation of character is a libel, and the person libeled may recover damages, unless it be shown that the publication was true, or that it was justifiably made. Malice is said to be essential to an action for libel, but it is malice in a special and technical sense, which exists in the absence of lawful excuse and where there may be no spite or ill-will or disposition to injure others. Every publication having the other qualities of a libel, if wilful and unprivileged, is in law malicious. The publication of words actionable in themselves, is sufficient evidence of legal malice. Legal malice exists where a wrongful act is done intentionally."

3. It is not a valid defense in this action for the defendant to show that it is true that the Newman family, the neighbors or others, had stated, reported or believed of the plaintiff, the matters detailed in the publication complained of. To amount to a justification on the ground of truth, the defendant must prove the truth of the statements, reports and beliefs themselves, which it published of and concerning the plaintiff. *Answer:* Affirmed. This is a very clear and definite statement of what I have been in my general charge trying to impress upon the jury upon that point. [2]

4. [The publication by defendant of the article complained of is not privileged from liability as for a libel. There was no occasion for or duty upon the defendant to make the publication, nor was it of a matter or matters in which the public had an interest.] There could be no proper motive of the publication as it was made, and in the nature of the case no reasonable and probable cause. Moreover, even if the fact that the talk about the plaintiff existed, and it was a matter of interest to the public, yet the manner of the publication went beyond the proper statement of the fact, and deprived the publication of excuse on the ground of privilege. *Answer:* We decline to answer this point as a whole, as being complex and argumentative taken as a whole. The part in brackets, however, is affirmed.

5. If the jury find a verdict in favor of the plaintiff the

amount which they should return as compensation for the injury done to the plaintiff is to be measured by what they deem to be just, considering the plaintiff's injured feelings and tarnished reputation, and taking into account the nature of the imputation, the extent of its publicity, and character, condition and influence of the parties; [and, if satisfied from the evidence that the defendant by its publication wantonly and recklessly defamed the plaintiff, the jury may give the plaintiff exemplary damages.] *Answer :* Affirmed, except the latter part in brackets. We can see nothing in the case which fairly indicates the article was published under such circumstances as would justify exemplary damages. There is nothing in the case which indicated that the defendant published the article out of actual malice. As a whole the point is refused. To justify, as has been said by Judge TRUNKEY, exemplary damages there must be evidence of actual malice by the party charged. In this case there is no evidence of actual malice, and therefore we instruct you that your damages, if you find for the plaintiff, must be limited merely to compensation, and that compensation is based upon what is suggested in this point: "Compensation for the injury done to the plaintiff is to be measured by what they deem to be just, considering the plaintiff's injured feelings and tarnished reputation, and taking into account the nature of the imputation, the extent of its publicity, and the character, condition and influence of the parties."

The case is submitted to you.

*Errors assigned* were, (1) answer to defendant's first point, reciting same; (2) error in answer to plaintiff's third point, reciting same; (3) error in portion of the general charge, reciting same.

*Geo. C. Wilson,* with him *W. D. Evans,* for appellant.—Whatever the law of libel may have been in criminal cases, the rule in civil cases has always been that the truth was and is a justification: Press Co. v. Stewart, 119 Pa. 602; Brewster's Practice, 527.

*Boyd Crumrine,* with him *John H. Murdoch, E. E. Crumrine* and *J. P. Patterson,* for appellee.

OPINION BY RICE, P. J., July 16, 1896 :

Any malicious publication, written, printed or painted, which by words or signs, tends to expose a person to contempt, ridicule, hatred or degradation of character is a libel; and the person libeled may recover damages, unless it be shown that the publication was true or was justifiably made : Pittock v. O'Neill, 63 Pa. 253; Barr v. Moore, 87 Pa. 385; Neeb v. Hope, 111 Pa. 145; Collins v. Dispatch Co., 152 Pa. 187. By this definition the alleged libelous matter must " tend " or, as it is sometimes stated, " be calculated " to injure. Were it not for the testimony in this case we might hesitate to believe that the article in question could, by any possibility, tend or be calculated to make the plaintiff infamous or odious, for the reason that it seems incredible that a belief in witchcraft should be entertained by any one in this age. But the fact being established that such belief is still prevalent, to some extent at least, amongst that class of people to which the plaintiff belonged, a publication like the one in question would be quite as injurious in a legal sense as if it had charged, in the same way, any common dereliction. The defamatory accusation need not be one which every one would credit. We cannot state what we mean any more clearly than by quoting from the charge of the learned judge who presided at the trial : " Now, when you come to that you have got to take the world as you find it, and people who publish newspapers have got to take the people as they know them, or are bound to know them to be. If this was an article read in some society of learned men who did not believe in such things as witchcraft, or that there were such things as witches, probably it would have no effect at all; they would not believe it, and therefore it would do no harm. But you have heard the testimony, and you have your own knowledge on that point—a knowledge of the superstitions of the masses of the people, and if with that knowledge you are led to believe that being called a witch would be calculated to injure the reputation of another and injure his standing in society, then it becomes libelous and becomes the foundation for damages." This was a correct and plain statement of the law applicable to the case; for, strange as it may seem, there was ample evidence to warrant the jury in finding specially the following facts, if they had been requested so to do. First. There is and was a

considerable number of persons living in the community where the plaintiff resides, and where the newspaper containing this alleged defamatory article had a large circulation, who believe in witchcraft. Second. The publication had a tendency to produce and assisted in producing in the minds of persons entertaining such belief the further belief that Irena Oles, the plaintiff, was a witch, and to produce in the minds of some such the belief that the malady from which the Newman boy was suffering was a possession of devils for which the plaintiff was responsible. Third. In consequence of this belief she was subjected to insults and assaults, was hooted at, called witch, and stoned upon the streets, was shunned by her neighbors, and suffered loss in her business and occupation. There being testimony that these things occurred afterwards and not before, it was for the jury to say how far the publication had a tendency to produce and did produce the false and injurious opinion entertained of her. Whether or not the defendant actually intended to accomplish this result is not the question. A man is supposed to intend the natural consequence of his own intentional act; therefore it would be no defense for the writer to say that he did not suppose that the assertions made by the Newmans and their neighbors would be credited by others. It is not claimed, and in the light of the evidence tending to establish the foregoing facts, it could not be seriously argued, that the court should have instructed the jury that the publication was not libelous. It was none the less libelous because it was a mere recital of what was believed and asserted by others.

Where there is no confidential relation, no existing duty, and no common interest, every repetition of a slander is a wilful publication of it: Odgers on Libel and Slander, *162, Bl. ed. 124 ; 13 Am. & Eng. Ency. of Law, 374.

In Collins v. Dispatch Co., 152 Pa. 187, the newspaper did not assert that the plaintiff had been unduly intimate with the woman referred to, but only that complaints had been made to a public department that such was the case, and yet it was not suggested that the article was not libelous. But it is unnecessary to multiply authorities upon so plain a proposition. Indeed it is not questioned in the assignments of error or in the argument.

Was it a defense to prove that the parents of the Newman boy and their neighbors said and believed that the plaintiff was a witch, and that his malady .was caused by her malign influence? This is the only question fairly raised by the assignments of error. The truth of defamatory words is a complete defense to a civil action of libel or slander. This is the generally accepted rule, although 'neither the justice nor the expediency of it is universally conceded. It is the rule in Pennsylvania: Stewart v. Press Co., 119 Pa. 584–602. But the onus of proving the words are true lies on the defendant, and in general the whole libel must be proved true, not a part merely. If by this is meant that the defendant need only to prove the truth of what he asserts in the writing to be true, then it must be conceded that the defendant made out a good defense. The reporter asserted nothing as to the truth of what was said and believed by the Newmans and their neighbors, but, having stated what they said and believed and the facts which seem to have been influential in their minds, left the public to draw their own conclusions. But if the defendant must prove the truth of the defamatory charges and assertions to which he has given greater currency by repetition, then a good defense was not made out. The latter is the true rule and is the only one consistent with the other well established rule that one who, without the excuse of " privilege," repeats a defamatory accusation is deemed to have published it, and is liable to action although he gives the name of the author. The fourth resolution in Lord Northampton's case, 12 Rep. 134, which runs as follows: " In a private action for slander of common person if J. S. publish that he hath heard J. A. say that J. G. was a traitor or a thief, in an action on the case, if the truth be such he may justify," has been discarded in England and by most of the courts in this country as neither authoritative nor sound in principle. It is now generally held that in the case supposed J. S. must prove that J. G. was a traitor or a thief in order to make a complete defense: Odgers on L. & S. * 174; Townshend on S. & L. secs. 210, 211; 13 Am. & Eng. Ency. of Law, 376, 395; 2 Addison on Torts (Wood's ed.), sec. 1146; Pollock on Torts, *218, 219. We have not undertaken to collect the cases upon the subject, but these are a few leading ones where the doctrine is held substantially as we have stated it: McPherson

v. Daniels, 10 B. & C. 272–273, (21 E. C. L. R.); Bennett v. Bennett, 6 C. & P. *588; Watkin v. Hall, L. R. 3 Q. B. Cases, 396; Kenney v. McLaughlin, 5 Gray, 3; Stevens v. Hartwell, 11 Metc. 542; Hawes v. Welling, 7 Oh. 253; Dole v. Lyon, 10 Johns. R. *447; Hotchkiss v. Oliphant, 2 Hill, 510.

It is to be borne in mind that the material part of the cause of action in libel is not the writing, but the publication of the libel. Upon this principle it was held very early in the history of this commonwealth that in a civil action for libel (it was suggested that there might possibly be a distinction between libel and slander) against a printer, his inserting the name of the author was no justification, though it might go in mitigation of damages: Runkle v. Myer, 3 Y. 518. We are not aware that this ruling or the doctrine on which it was based has been questioned in any later decision of the Supreme Court. The justice of the rule, and the reasons in support of it are so clearly stated in the opinion of LITTLEDALE, J., in McPherson v. Daniels, supra, that we feel justified in making this extended quotation therefrom. He says: "The truth is an answer to the action, not because it negatives the charge of malice (for a person may wrongfully or maliciously utter slanderous matter, though true, and thereby subject himself to an indictment) but because it shows that the plaintiff is not entitled to recover damages. For the law will not permit a man to recover damages in respect of an injury to a character which he either does not, or ought not to possess. Now a defendant by showing that he stated at the time when he published slanderous statements of a plaintiff that he heard it from a third person, does not negative the charge of malice, for a man may wrongfully and maliciously repeat that which another may have uttered upon a justifiable occasion. Such a plea does not show that the plaintiff has not sustained or is not entitled in a court of law to recover damages. As great an injury may accrue from the wrongful repetition as from the first publication of slander; the first utterer may have been a person insane or of bad character. The person who repeats it gives greater weight to the slander. A party is not the less entitled to recover damages in a court of law for injurious matter published concerning him, because another person previously published it."

We have thus far been speaking of publications for which

there is no legal excuse. In his general charge, as well as in his answer to the plaintiff's fourth point, the learned judge instructed the jury that the publication was not privileged. As these instructions are not assigned for error, we might properly omit to say anything with regard to that matter, but in view of the suggestion made in the appellant's history of the case that the article on its face is but a plain recital of events which actually transpired in this community, and in which the public had an interest, it will not be out of place to add a few words upon that point. It is more than a mere recital of events; it is also a substantially correct report of what the Newmans and their neighbors believed and said of and concerning the plaintiff. Complaint is made not so much of the incorrectness of the report as of the false and defamatory character of the matter reported. The publication was not made upon any occasion that rendered a repetition thereof privileged upon the grounds of public policy. It is to be judged by itself and not in connection with some other transaction of which possibly it might have formed a necessary part, and of which as a whole it might have been to the interest of the public to be informed. Thus judged it was not a matter in which the public had any interest except that which arises out of idle curiosity and vitiated appetite for the sensational. The plaintiff neither held nor sought a public position, and stood in no such relation to the public as to make it important for them to know that the Newmans believed and said that she was a witch. No duty of perfect or imperfect obligation, legal, moral or social or otherwise, rested on the defendant to make that fact known to others. She was a harmless old woman whose livelihood depended upon the good will and good opinion of the people of the community in which she lived. Instead of the occasion being one which made the publication proper for public investigation and information, the very fact that a few superstitious persons entertained the false and unfounded belief that she was a witch ought to have shielded her against a more extended circulation of the injurious rumor by those who must have known that it was not founded on truth.

We are of the opinion that the court correctly held that proof that the parents of the Newman boy and their neighbors said and believed that the plaintiff was a witch, and that his malady

was due to her malign influence, was not such proof of the truth of the publication as would constitute a defense.

The specifications of error are overruled and the judgment is affirmed.