# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Claude Thomas | : | |
| | : | |
| v. | : | No. 2236 C.D. 2015 |
| | : | No. 2416 C.D. 2015 |
| Kathleen G. Kane and | : | Argued:  September 13, 2016 |
| Kevin L. Wevodau | : | |
| | : | |
| Appeal of: Kathleen G. Kane | : | |

BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE P. KEVIN BROBSON, Judge (P.)
HONORABLE ANNE E. COVEY, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                         **FILED:  October 17, 2016**

In these consolidated cross-appeals, Appellant Kathleen G. Kane (Kane) and Appellee Claude Thomas (Thomas)[1] appeal from the interlocutory order of the Court of Common Pleas of Philadelphia County (trial court), dated August 17, 2015.  The trial court, *inter alia*, sustained Kane's preliminary objections to Counts I, II, III, IV, VI and VII of Thomas' Amended Complaint based on the doctrine of absolute immunity and overruled Kane's preliminary objection to Count V of Thomas' Amended Complaint.  For the reasons set forth below, we affirm in part, reverse in part, and remand for further action by the trial court.

---

[1] This Court had previously designated Kane as appellant and Thomas as appellee pursuant to Pennsylvania Rule of Appellate Procedure 2136.

Thomas' Amended Complaint sets forth the following factual averments. Thomas, an African-American law enforcement officer, began working for the Pennsylvania Attorney General's office in 1990 as an undercover narcotics agent. (Reproduced Record (R.R.) at 26a-27a; Am. Compl. at ¶¶ 27, 31.) In 2007, Thomas was promoted to Senior Supervisory Special Agent.[2] (R.R. at 28a; Am. Compl. at ¶ 36.) In that position, Thomas was involved in a highly-confidential public corruption sting operation, which was initiated by former Attorney General Thomas Corbett and supervised by former Chief Deputy Attorney General Frank Fina ("Fina"). (R.R. at 21a, 28a, 35a; Am. Compl. at ¶¶ 5-6, 40, 83-84.) As part of the sting operation, Thomas investigated the activities of Pennsylvania legislators to determine whether any such legislators were involved in public corruption activities. (R.R. at 21a, 35a; Am. Compl. at ¶¶ 5, 83.) After she became Attorney General of Pennsylvania in January 2013, Kane secretly "killed" the sting operation, even though Thomas had "caught certain of these Pennsylvania state legislators virtually red-handed committing public corruption crimes." (R.R. at 22a, 35a-36a; Am. Compl. at ¶¶ 7, 85.)

On March 13, 2014, after learning that Kane had terminated the sting operation, *The Philadelphia Inquirer* ("*Inquirer*") contacted Kane and informed her that the *Inquirer* intended to publish an article about the subject on March 16, 2014. (R.R. at 36a; Am. Compl. at ¶ 88.) On March 14, 2014, before the *Inquirer* published the article, Kane, with the assistance of Kevin L. Wevodau ("Wevodau"), the Special Agent in Charge of the Bureau of Criminal

---

[2] Thomas resigned from his position as Senior Supervisory Special Agent in June 2013 and joined the public corruption unit in the Philadelphia District Attorney's office. (R.R. at 29a; Am. Compl. at ¶ 43.)

2

Investigations for the Attorney General's office, prepared, issued, and delivered to the media a written statement entitled "Statement by the Office of Attorney General Regarding OAG Case File No. 36-622," which detailed the reasons why Kane and her staff determined that prosecution of the public corruption case was not advisable. (R.R. at 38a-39a; Am. Compl. at ¶¶ 95, 99 and Ex. K.) Thomas alleged that this written statement contained false and defamatory assertions of fact regarding Thomas, including: (1) the sting operation focused "specifically [on] members of the 'Black Caucus;'" and (2) "the OAG Agent who managed the [confidential informant] was debriefed by current senior OAG executive staff members[,]" and "the OAG Agent indicated that he was instructed by his supervising OAG Attorney to focus only on members of the General Assembly's Black Caucus and that when he had information of potentially illegal acts by white members of the General Assembly he was specifically told not to pursue it" and that "his supervising OAG Attorney promised him a promotion and cash bonus for working on the investigation." (R.R. at 38a, 40a-41a; Am. Compl. at ¶¶ 96, 99, 102 and Ex. K.) While the written statement did not identify Thomas by name, Thomas alleged that it was understood among law enforcement agencies and the Philadelphia Police Department that "OAG Agent" referred to Thomas. (R.R. at 41a; Am. Compl. at ¶¶ 103-05.) In addition, Thomas was identified by name when the *Inquirer* ran its article as scheduled on March 16, 2014. (R.R. at 41a-42a; Am. Compl. at ¶¶ 106-07 and Ex. N.)

On March 17, 2014, Kane, with the assistance of Wevodau, issued a verbal statement to the media in a press conference regarding the termination of the sting operation and the reasons that Kane and her staff believed the case was not prosecutable. (R.R. at 39a, 42a-45a, 109a-34a; Am. Compl. at ¶¶ 100, 109 and

3

Ex. L.) Thomas alleged that this verbal statement contained false and defamatory assertions of fact regarding Thomas, including: (1) there was documentary evidence that the sting operation involved racial targeting and two individuals had reported that they had been informed to target members of the Black Caucus; (2) the potential racial targeting, as well as other factors, tainted the case; and (3) there was no reason to question the involved legislators because there was no chance of rehabilitating the case due to racial targeting. (R.R. at 42a-45a, 109a-34a; Am. Compl. at ¶ 109 and Ex. L.) Thereafter, on March 24, 2014, the *Inquirer* published a letter, prepared, signed, and submitted by Thomas, in which Thomas refuted Kane's false and defamatory statements and disclosed that he was the lead investigator on the sting operation. (R.R. at 31a, 78a-80a; Am. Compl. at ¶ 60 and Ex. D.) In addition, Thomas also underwent a televised interview with Philadelphia-based Fox 29 News, during which he again refuted Kane's false and defamatory statements. (R.R. at 31a; Am. Compl. at ¶ 61.)

On April 10, 2014, Kane, with the assistance of Wevodau, issued a second verbal statement to the media in a press conference regarding the sting operation. (R.R. at 39a-40a, 135a-82a; Am. Compl. at ¶¶ 101, 113 and Ex. M.) Thomas alleged that Kane retaliated against him through this verbal statement by publicly reaffirming the false and defamatory statements and by continuing to misrepresent the existence of documentary evidence of racial targeting. (R.R. at 46a; Am. Compl. at ¶ 112.) Thomas further alleged that this verbal statement contained false and defamatory assertions of fact regarding Thomas, including: (1) during an exit interview with Wevodau, Thomas indicated that he expected to be promoted and compensated for his work on the sting operation and that he was directed to target only the Black Caucus; (2) Wevodau took notes and

4

prepared an affidavit memorializing Thomas' statements during the exit interview; (3) after Thomas left employment with the Attorney General's office he would no longer cooperate with Kane and her staff; and (4) the credibility of those involved in the investigation, including Thomas, was questioned as a result of $74,000 in expenses for liquor and food, $1,400 in expenses for cigars and hotel rooms, and $32,000 of taxpayer money unaccounted for in connection with the sting operation. (R.R. at 46a-49a, 135a-82a; Am. Compl. at ¶¶ 112-13 and Ex. M.)

On May 26, 2015, Thomas filed his Amended Complaint, setting forth causes of action against Kane for defamation, invasion of privacy−false light, invasion of privacy−intrusion upon seclusion, invasion of privacy−publicity given to private life, violation of Article I, Section 1 of the Pennsylvania Constitution, concerted tortious conduct, and civil conspiracy and against Wevodau for concerted tortious conduct and civil conspiracy. Thomas alleged that the defamatory statements made by Kane, with Wevodau's assistance, on March 14, 2014, March 17, 2014, and April 10, 2014, were false and part of a personally-driven scheme to: (1) facilitate a cover-up of Kane's decision to allow her allies to avoid criminal prosecution for corruption; (2) shift the focus of the public and media attention from Kane's decision to terminate the sting operation to Thomas by portraying him as a "law-breaking, dishonest, unethical, incompetent, and greedy sell-out[;]" (3) drive a wedge between Thomas and Fina, who Kane regards as a personal enemy; (4) induce Philadelphia District Attorney Seth Williams ("Williams") to fire Thomas from his position in the newly-formed public corruption unit of the Philadelphia District Attorney's office; (5) influence Williams to not prosecute those Pennsylvania legislators implicated in the sting operation; (6) intimidate Thomas into silence; (7) retaliate against Thomas after he

5

had been forced to publicly protect his reputation; and (8) to discredit Thomas in the eyes of the public and the media so that no one would believe him. (R.R. at 22a-23a, 37a-38a; Am. Compl. at ¶¶ 9, 94-96). Thomas pursued his claims against Kane and Wevodau in their personal capacities only because Thomas believed that their actions were outside the scope of their authority. (R.R. at 55a-58a; Am. Compl. at ¶¶ 139-46.)

Kane and Wevodau filed preliminary objections to Thomas' Amended Complaint, seeking, *inter alia*, dismissal of all claims on the basis that Kane and Wevodau are entitled to absolute immunity and/or sovereign immunity and dismissal of Count V on the basis that Thomas is not entitled to a name-clearing hearing under the facts as alleged by Thomas in the Amended Complaint. (R.R. at 253a-54a.) Thomas filed a preliminary objection to Kane and Wevodau's preliminary objections, arguing that Kane and Wevodau's preliminary objections relating to absolute privilege and sovereign immunity were premature at the preliminary objection stage of the proceedings. (*Id.* at 257a-61a.) The trial court overruled Thomas' preliminary objection to Kane and Wevodau's preliminary objections, sustained Kane and Wevodau's preliminary objections to Counts I, II, III, IV, VI and VII of Thomas' Amended Complaint, and overruled Kane's preliminary objection to Count V of Thomas' Amended Complaint. In so doing, the trial court concluded based on the entirety of Thomas' Amended Complaint: (1) Kane was entitled to absolute immunity with respect to the tort claims asserted against her because her alleged defamatory statements were closely related to her duties as Attorney General; (2) Kane was not entitled to absolute immunity with respect to the constitutional claim because there was no request for damages and Kane would not be required to defend herself before a jury; (3) Kane was only

6

entitled to sovereign immunity with respect to the constitutional claim to the extent that Kane would be required to pay for the name-clearing hearing because, outside of any costs paid by Kane, there was no request to compel any affirmative action from the Commonwealth or Kane and it was not clear that Kane had acted within the course of her employment; (4) Wevodau was entitled to absolute immunity with respect to all claims asserted against him because he is a high public official and his actions were closely related to his duties as Special Agent in Charge of the Bureau of Criminal Investigations; and (5) the claim for equitable relief under Article I, Section 1 of the Pennsylvania Constitution was not free from doubt. (Trial Ct. Op. at 12-13, 15-17, 19-20, 22.)

Following the trial court's decision, Kane moved to transfer the case to this Court or, in the alternative, to amend the trial court's order to permit an interlocutory appeal with respect to the trial court's ruling on the constitutional claim. Thomas also moved to amend the trial court's order to permit an interlocutory appeal with respect to the trial court's dismissal of the tort claims. The trial court did not grant either request, and Kane and Thomas filed petitions for review with this Court. By per curiam order dated December 22, 2015, this Court granted Kane and Thomas' petitions for review and permitted Kane and Thomas to appeal the trial court's August 17, 2015 interlocutory order. In so doing, this Court identified the issues to be decided as follows: (1) "Does Article I, Section 1 of the Pennsylvania Constitution provide a cause of action in the nature of a "name-clearing hearing" against a state official in her personal capacity only[;]" and (2) "Whether the affirmative defense of absolute immunity can be applied when a state official acts outside the scope of her authority and employment."

7

On appeal,[3] Kane argues that the trial court erred in overruling her preliminary objection to Thomas' constitutional claim because there is no independent right to a name-clearing hearing under Article I, Section 1 of the Pennsylvania Constitution. In response, Thomas argues that Count V of his Amended Complaint asserts a cause of action for violation of his right to reputation under Article I, Section 1 of the Pennsylvania Constitution, which entitles him to equitable relief in the form of a name-clearing hearing. In his cross-appeal, Thomas argues that the trial court erred in sustaining Kane and Wevodau's preliminary objections to his tort claims because the facts as alleged in his Amended Complaint demonstrate that Kane and Wevodau are not entitled to absolute immunity−*i.e.*, their actions were outside the scope of their authority and bore no relationship to any legitimate business of the Commonwealth. In response, Kane and Wevodau argue that they are entitled to absolute immunity because they are high public officials and their actions were related to their official responsibilities and, thus, fell within the scope of their employment.

First, we address Kane's argument that there is no independent right to a name-clearing hearing under Article I, Section 1 of the Pennsylvania Constitution. More specifically, Kane argues that to the extent that the Pennsylvania Constitution recognizes the concept of a name-clearing hearing, it is only as a possible remedy for a violation of a public employee's right to procedural

---

[3] This Court's standard of review of a trial court's order sustaining preliminary objections to a complaint is limited to considering whether the trial court erred as a matter of law or committed an abuse of discretion. *Muncy Creek Twp. Citizens Comm. v. Shipman*, 573 A.2d 662, 663 (Pa. Cmwlth. 1990). In considering whether a trial court properly sustained preliminary objections, this Court accepts as true all well-pled facts and all inferences reasonably deducible therefrom. *Cowell v. Dep't of Transp.*, 883 A.2d 705, 707 n.2 (Pa. Cmwlth. 2005).

8

due process and only where such public employee can satisfy both prongs of the "stigma plus" test. Kane argues further that any order requiring that a name-clearing hearing be conducted would be in connection with an injunction, and Kane's sovereign immunity would preclude any such injunction. Kane also argues that Thomas' attempt to proceed against Kane only in her "personal capacity" is of no import because the ultimate question is whether Kane acted in the scope of her employment, not how the plaintiff captions the case.

> Article I, Section 1 of the Pennsylvania Constitution provides:
>
> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and *protecting property and reputation*, and of pursuing their own happiness.

(Emphasis added). Reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process and equal protection." *R. v. Dep't of Pub. Welfare*, 636 A.2d 142, 149 (Pa. 1994). "[A] cause of action arises directly under the [Pennsylvania] Constitution for the violation of rights guaranteed under [A]rticle I, [S]ection 1, and no affirmative legislation is needed for the vindication of those rights in the civil courts." *Hunter v. Port Auth. of Allegheny Cnty.*, 419 A.2d 631, 636 n.6 (Pa. Super. 1980). Nevertheless, the rights granted under Article I, Section 1 of the Pennsylvania Constitution, which includes the right to reputation, are inextricably intertwined with the right to due process. *See id.* at 635 (concluding that a cause of action exists under Article I, Section 1 of the Pennsylvania Constitution if "a person is denied public employment on the basis of a prior conviction for which he has been pardoned, unless the conviction is reasonably related to the person's fitness to perform the job sought, or to some other legitimate governmental objective" or

goal). In addition, a name-clearing hearing is a form of equitable relief granted by federal courts when "the government's stigmatizing comments rise to the level of a due process violation." *Ersek v. Twp. of Springfield*, 102 F.3d 79, 84 (3d Cir. 1996). Furthermore, "Pennsylvania does not recognize the existence of a cause of action for monetary damages pursuant to Article I, Section 1 of the Pennsylvania Constitution based on injury to reputation separate and apart from a claim for defamation." *Balletta v. Spadoni*, 47 A.3d 183, 201 (Pa. Cmwlth. 2012).

In this case, Thomas acknowledges that "his request for a name-clearing hearing is not the cause of action, but merely the requested equitable remedy." (Thomas' Br. at 28.) Thomas, however, has not cited a single Pennsylvania case that entitles him to a name-clearing hearing as a remedy for a violation of his right to reputation under Article I, Section 1 of the Pennsylvania Constitution. Rather, Thomas focuses his argument solely on the issue of whether Article I, Section 1 of the Pennsylvania Constitution allows him to state a cause of action against Kane for a violation of his right to reputation. We do not dispute that under the proper facts an individual could make out an independent cause of action for a violation of Article I, Section 1 of the Pennsylvania Constitution. Thomas, however, has not done so, because he has not alleged that he has been deprived of any due process rights in connection with the violation of his right to reputation under Article I, Section 1 of the Pennsylvania Constitution. *See Hunter*, 419 A.2d at 635. Rather, Thomas simply alleged that Kane's defamatory statements have harmed his reputation and, therefore, if he can prove that Kane's statements were false, he would be entitled to a name-clearing hearing. If this Court were to accept Thomas' interpretation of the right to reputation under Article I, Section 1 of the Pennsylvania Constitution and conclude that Thomas

would be entitled to a name-clearing hearing simply because Thomas believes that Kane's alleged false and defamatory statements harmed his reputation, we would be setting a precedent that any time a governmental actor made a statement that an individual believed harmed his reputation, that individual would be entitled to a name-clearing hearing under Article I, Section 1 of the Pennsylvania Constitution. This simply is not supported by the existing case law and is not an extension of the law that this Court is willing to make at this time. To the extent Pennsylvania recognizes a cause of action under Article I, Section 1 of the Pennsylvania Constitution for a violation of the right to reputation, there must be both an adverse government action in the form of stigmatizing, false statements and a due process violation. *See Hunter*, 419 A.2d at 635.

For these reasons, we conclude that Article I, Section 1 of the Pennsylvania Constitution does not provide Thomas with the equitable remedy of a name-clearing hearing under the facts as alleged in the Amended Complaint.[4] As a

---

[4] Because we have determined that Article I, Section 1 of the Pennsylvania Constitution does not provide Thomas with the equitable remedy of a name-clearing hearing under the facts as alleged in the Amended Complaint, there is no need for us to address the specific issue posed by the Court in its December 22, 2015 per curiam order−*i.e.*, "[d]oes Article I, Section 1 of the Pennsylvania Constitution provide a cause of action in the nature of a "name-clearing hearing" against a state official in her personal capacity only?" For this issue to have become relevant to our determination in this case, we would have been required to first determine that Thomas was entitled to a name-clearing hearing. The analysis would then have become whether Kane was entitled to absolute immunity or sovereign immunity if her actions were outside the scope of her authority or employment−*i.e.*, in her personal capacity. Nevertheless, we note that the trial court's conclusion that Kane was not entitled to sovereign immunity with respect to Thomas' constitutional claim is inconsistent with its absolute immunity analysis with respect to Thomas' tort claims. It goes without saying that if Kane was acting within the scope of her authority/employment for absolute immunity purposes, she also would have been acting within the scope of her authority/employment for sovereign immunity purposes.

11

result, the trial court erred in overruling Kane's preliminary objection to Count V of Thomas' Amended Complaint.

Next, we address Thomas' argument that Kane and Wevodau are not entitled to absolute immunity. More specifically, Thomas argues that absolute immunity is unavailable to Kane and Wevodau because: (1) Kane and Wevodau have been sued in their personal capacities; (2) Wevodau is not a high governmental official; (3) Kane and Wevodau's actions against Thomas were unrelated to public business; and (4) Kane and Wevodau's actions were not within the scope of their authority.

"The common law doctrine of 'high official immunity' insulates 'high-ranking public officials' from all statements made and acts taken in the course of their official duties." *Feldman v. Hoffman*, 107 A.3d 821, 826 (Pa. Cmwlth. 2014), *appeal denied*, 121 A.3d 497 (Pa. 2015). As the Pennsylvania Supreme Court established in *Matson v. Margiotti*, 88 A.2d 892 (Pa. 1952), *rev'd on other grounds*, *Commonwealth v. Schab*, 383 A.2d 819 (Pa. 1978), and reconfirmed in *Lindner v. Mollan*, 677 A.2d 1194, 1195 (Pa. 1996):

> Absolute privilege, as its name implies, is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction.

*Matson*, 88 A.2d at 895. "[W]here an official is entitled to absolute [immunity], any personal or political motives are immaterial, as is the presence of malice or want of reasonable and probable cause or the fact that the innocent may sometimes

12

suffer irreparable harm." *Osiris Enters. v. Borough of Whitehall*, 877 A.2d 560, 566 (Pa. Cmwlth. 2005), *appeal denied*, 897 A.2d 459 (Pa. 2006).

First, we must determine whether Kane and Wevodau are high public officials. "The determination of whether a particular individual qualifies as a 'high-ranking public official' must be [considered] on a case-by-case basis." *Feldman*, 107 A.3d at 827. Factors that a court may consider in determining whether an individual qualifies for immunity as a high official are: (1) the nature of the individual's duties; (2) the importance of the individual's office; and (3) whether the individual has policy-making functions. *Id.* "While it is often the case that 'high public officials' have policy-making functions, that is not the sole or overriding factor in determining the scope of immunity. Rather, it is the public interest in seeing that the official not be impeded in the performance of important duties that is pivotal." *Durham v. McElynn*, 772 A.2d 68, 70 (Pa. 2001).

There is no question that Kane, as Attorney General, was a high public official at the time that the alleged defamatory statements were made. *See Feldman*, 107 A.3d at 827. In addition, we agree with the trial court that Wevodau, as Special Agent in Charge of the Bureau of Criminal Investigations, was also a high public official at the time of his alleged improper actions. Section 206 of the Commonwealth Attorneys Act[5] provides, in pertinent part, that the Attorney General is "the chief law enforcement officer of the Commonwealth" and has "the power to investigate any criminal offense which [she] has the power to prosecute." In order to assist her with her duties of criminal investigation, Kane appointed Wevodau as Special Agent in Charge of the Bureau of Criminal

---

[5] Act of October 15, 1980, P.L. 950, 71 P.S. § 732-206.

13

Investigations to oversee all criminal investigations conducted by the Attorney General's office. Wevodau's position and duties are essential to Kane's ability to perform her duties as the chief law enforcement officer of the Commonwealth. It is in the public's interest to ensure that Wevodau's duties and responsibilities are not impeded so that individuals committing crimes against the Commonwealth can be investigated and prosecuted for their crimes. Therefore, we conclude that Wevodau was a high public official at the time of his alleged improper conduct.

Second, we must determine whether Kane and Wevodau's statements and actions were within the scope of their authority. Thomas urges this Court to conclude that Kane and Wevodau are not entitled to absolute immunity simply because Thomas has sued Kane and Wevodau in their personal capacities only. There is no question that the affirmative defense of absolute immunity cannot be applied when a state official acts outside the scope of his or her authority and employment. The relevant inquiry, however, is not how Thomas captions the matter, but whether the facts as alleged by Thomas in his Amended Complaint establish that Kane and Wevodau's statements and actions were outside the scope of their authority. The facts set forth in Thomas' Amended Complaint do not establish that Kane and Wevodau acted outside the scope of their authority as Attorney General and Special Agent in Charge of the Bureau of Criminal Investigations.

Whether a high public official was acting within the scope of his or her authority for absolute immunity purposes is contingent upon whether the conduct at issue was "closely related" to the performance of official duties. *Osiris*, 877 A.2d at 567. With respect to defamation, Pennsylvania courts have identified two factors used to assist a court in determining whether statements and actions are

14

closely related to a high official's duties: "(1) the formality of the forum in which the words were spoken or published; and (2) the relationship of the legitimate subject of governmental concern to the person seeking damages for the defamatory utterance." *Id.* at 568.

In his Amended Complaint, Thomas alleges that Kane's defamatory statements were made in a formal written statement issued by the Attorney General's office and in two press conferences given to the media and public. Thomas also alleges that Kane's defamatory statements were made to apprise the public of the reasons why she terminated the public corruption sting operation. These statements were closely related to Kane's duties as the chief law enforcement officer of the Commonwealth because such statements were made in a formal public forum to apprise the public of the reasons why the Attorney General's office determined that the public corruption case was not prosecutable. The public has an interest in knowing that a criminal investigation paid for by the taxpayers has been terminated and the reasons why the case will be not prosecuted. As such, Kane was acting within the scope of her authority as Attorney General when she made the alleged defamatory statements.

With respect to Wevodau, Thomas only alleges that Wevodau assisted Kane in preparing and issuing the false and defamatory statements. Based on our conclusion that Kane was acting within the scope of her authority as Attorney General when she made the alleged defamatory statements, we must also conclude that Wevodau was acting within the scope of his authority as Special Agent in Charge of the Bureau of Criminal Investigations when he assisted Kane in preparing and issuing such statements. In addition, we note that the fact that Kane and Wevodau's statements and actions may have been false, made with malice or

15

personal animosity against Thomas, or made to further Kane and Wevodau's personal interests does not change the analysis for the purposes of absolute immunity. Absolute immunity is unqualified and applies even if the high official's statements and actions are motivated by malice or personal motives. *See Lindner*, 677 A.2d at 1195; *Osiris*, 877 A.2d at 566. Therefore, we conclude that Kane and Wevodau's actions as alleged by Thomas in his Amended Complaint were within the scope of their authority.

For these reasons, we conclude that Kane and Wevodau are entitled to absolute immunity under the facts as alleged by Thomas in his Amended Complaint. As a result, the trial court properly sustained Kane and Wevodau's preliminary objections to Counts I, II, III, IV, VI, and VII of the Amended Complaint.

Accordingly, we affirm the trial court's order with respect to the dismissal of Counts I, II, III, IV, VI, and VII of the Amended Complaint on the basis of absolute immunity and reverse and remand the trial court's order with respect to Count V of the Amended Complaint with instructions that the trial court dismiss Count V of the Amended Complaint.

_____
P. KEVIN BROBSON, Judge


Judge Hearthway did not participate in the decision of this case.

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Claude Thomas                                :
                                             :
            v.                               :    No. 2236 C.D. 2015
                                             :    No. 2416 C.D. 2015
Kathleen G. Kane and                         :
Kevin L. Wevodau                             :
                                             :
Appeal of: Kathleen G. Kane                  :

# **O R D E R**


AND NOW, this 17th day of October, 2016, the order of the Court of Common Pleas of Philadelphia County (trial court) is hereby AFFIRMED in part and REVERSED in part, and the matter is REMANDED to the trial court with instructions to dismiss Count V of the Amended Complaint.

Jurisdiction relinquished.


_____
P. KEVIN BROBSON, Judge