**Russell McKIBBEN, Appellee,**

v.

**Agnes SCHMOTZER, Appellant.**

**Russell McKIBBEN, Appellant,**

v.

**Agnes SCHMOTZER, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 18, 1996.
Filed Aug. 11, 1997.

George W. Jacoby, Pittsburgh, for Agnes Schmotzer.

Paul J. McArdle, Pittsburgh, for Russell McKibben.

Before DEL SOLE, POPOVICH and HESTER, JJ.

**POPOVICH, Judge:**

This is an appeal from the order of the Court of Common Pleas of Allegheny County which granted a new trial on liability and damages on Russell McKibben's malicious prosecution and two defamation claims, one for slander and one for libel. Following trial in this matter, the jury found that Agnes Schmotzer had both defamed and instituted a malicious prosecution of McKibben and awarded $50,000 in compensatory and $30,000 in punitive damages.

In determining that a new trial was warranted, the lower court ruled that Agnes Schmotzer, who was mayor of the Borough of Dormont, was a "high public official" and, therefore, was immune from liability for the defamation of Russell McKibben, who was chief of police of the Borough of Dormont, to the extent that her statements were made within the scope of the mayor's official duties. The court further ruled that "since the issues of liability for libel and slander are inextricably intertwined with the issues of liability for malicious prosecution and with the issue of total damages, a new trial must be held on all issues." Opinion of March 14, 1996, p. 7. Upon review, we must reverse the lower court's conclusion that a new trial on all counts of the complaint is necessary. Rather, we conclude that Mayor Schmotzer is entitled to judgment as a matter of law on Chief McKibben's claim of libel. Further, we find that a new trial is required as to damages *only* on Chief McKibben's malicious prosecution and slander causes of action.

Herein, Chief McKibben raises numerous issues regarding whether a mayor of a borough should be afforded the status of a "high public official" such that the mayor is immune from liability for defamatory statements. Mayor Schmotzer has also appealed the trial court's ruling and claims Chief McKibben's malicious prosecution action must fail as a matter of law since there was a finding of probable cause when she filed her private criminal complaint for simple assault against Chief McKibben.

A review of the procedural and factual history of this case is warranted. On May 21, 1993, Chief McKibben filed a civil complaint which included claims for malicious prosecution, libel and slander. Extensive pre-trial litigation ensued, including pre-trial rulings on Mayor Schmotzer's claims that she was immune from the defamation claims due to her status as a "high public official" and her criminal complaint against Chief McKibben was filed with probable cause. Those defenses were rejected by the court below, and trial commenced on all claims on January 30, 1995.

On January 4, 1993, the Dormont Borough Council unanimously appointed Russell McKibben to the post of acting chief of police. Apparently, Mayor Schmotzer supported another candidate for the position. The next day, Chief McKibben and Mayor Schmotzer met to discuss the state of the Dormont police force. Mayor Schmotzer was the first to arrive at the Dormont Municipal Building which also serves and the police station, and she sat at the chief's desk in the building's main office. The main office had traditionally been occupied by both the mayor and chief of police, and the long-standing custom was for the Chief to use the larger desk in the office since the job of mayor in

Dormont was a *de facto* part-time position.[1] An argument between the two ensued when Mayor Schmotzer told Chief McKibben that the office was hers and she could order him out if she wished. During the argument, Mayor Schmotzer attempted take the telephone from the Chief's possession, and she injured her thumb.

Mayor Schmotzer then accused Chief McKibben of physically assaulting her by pushing her and slamming the phone down upon her hand. She demanded that the dispatcher on duty at the police station take an assault report. Chief McKibben directed the dispatcher not to take the report since he knew the allegations to be false and the dispatcher was not authorized to perform such a task. Later, Chief McKibben directed another officer not to take the report after Mayor Schmotzer demanded the same action of him. The Mayor and Chief subsequently reviewed the day's paperwork, and then Mayor Schmotzer went home. Later that morning, Mayor Schmotzer went to the emergency room of St. Clair Memorial Hospital and complained of an injury to her hand. She was examined, x-rayed and released after being given a brace to wear.

The following day, Mayor Schmotzer notified Chief McKibben that she was suspending him from duty for "conduct unbecoming of a police officer, insubordination and assault and battery." She also contacted the Allegheny County District Attorney's office and demanded that Chief McKibben be investigated and criminally charged with assault. Next, on January 8, 1993, Mayor Schmotzer drafted and released to Allegheny County media outlets a "News Release" on Dormont Police Department stationary which, *inter alia*, accused Chief McKibben of a "brutal and unprovoked assault and battery on myself, the Mayor" and stated, "[t]he lack of self-discipline on McKibben;s (sic) part is proof he is unfit to serve in his management capacity." Both the Pittsburgh *Post–Gazette* and *Tribune Review* published articles on the incident. The *Keystone Times Journal* published a front-page article with the headline, "Police Chief Assaults Mayor."

Ten days after release of the mayor's "News Release", the Dormont Borough Council met and unanimously reinstated McKibben as Acting Chief of Police.[2] Council also voted to censure the mayor for her reckless handling of the incident. Meanwhile, the district attorney conducted an investigation of the mayor's allegations and decided not to file criminal charges against Chief McKibben. Consequently, Mayor Schmotzer filed a private criminal complaint wherein she formally accused Chief McKibben of simple assault. Judge Novak of the Allegheny County Court of Common Pleas was designated as the issuing authority, and, after review of the complaint, he determined that there was probable cause, accepted the private criminal complaint and issued process in the form of a *subpoena*, given the sensitive nature of the case. However, following the preliminary hearing, Judge Novak dismissed the private criminal complaint due to the Commonwealth's failure to set forth a *prima facie* case.[3]

Immediately following the hearing, Mayor Schmotzer told a reporter from the Pittsburgh *Post–Gazette* that Chief McKibben had lied on the witness stand, stating, "The acting chief lied. He has to wash his face in the morning and I hope he likes what he sees." Several days later, Mayor Schmotzer's comments were published in an article in the *Post–Gazette*.

In addition to his liability evidence, Chief McKibben presented numerous witnesses who testified that Mayor Schmotzer's press release, accusations and prosecution of appellant were extremely upsetting to him and his

---

1. The Chief of Police of the Borough of Dormont is a full-time position endowed with a substantial salary, while the Mayor's job earns a salary of less than $3,000 per year.

2. We note that Russell McKibben was permanently named Chief of Police in June of 1993, by the Dormont Borough Council, and Agnes Schmotzer is no longer mayor.

3. We note that the district attorney fully prosecuted this matter in a professional manner and examined numerous witnesses at the preliminary hearing, including Mayor Schmotzer and Chief McKibben.

family and severely damaged his reputation which is especially important to a law enforcement official.

The jury then considered the evidence and in response to interrogatories, found: 1) Mayor Schmotzer initiated criminal proceedings against Chief McKibben with malice and without probable cause; 2) The statements made in Mayor Schmotzer's "News Release" about Chief McKibben which was dated January 8, 1993, were not true; 3) The statements made in Mayor Schmotzer's "News Release" about Chief McKibben which was dated January 8, 1993, were made with malice; 4) The statements made by Mayor Schmotzer about Chief McKibben following his preliminary hearing on April 23, 1993, were not true; and 5) The statements made by Mayor Schmotzer about Chief McKibben following his preliminary hearing on April 23, 1993, were made with malice. The jury then awarded Chief McKibben $50,000 in compensatory and $30,000 in punitive damages. The damages award did not distinguish the amount of damages which were awarded for each specific count of the complaint. In response to Mayor Schmotzer's counterclaim, the jury specifically found that Chief McKibben did not commit a battery against Mayor Schmotzer on January 5, 1993, and that he did not negligently injure her on January 5, 1993.

Mayor Schmotzer then filed post-verdict motions which again raised the issue of her status as a "high public official" who is immune from liability for defamation and the issue that the malicious prosecution claim must fail as a matter of law because Judge Novak found probable cause existed in the criminal action. As previously stated, Judge Alan S. Penkower reversed his pre-trial decision and determined that Mayor Schmotzer was, in fact, a "high public official" who is immune from liability for actions taken within the scope of her duties as mayor. Thus, Judge Penkower ordered a new trial to determine whether Mayor Schmotzer's statements, both written and oral, were made within the scope of her duties, and he ordered a new trial on the malicious prosecution claim because it was inextricably intertwined with the defamation claims.

We now turn to Chief McKibben's assertion that a mayor of a borough should not be afforded the status of a "high public official" such that the mayor is immune from liability for defamatory statements made within the scope of his or her official duties.[4] In the recent case of *Lindner v. Mollan*, 544 Pa. 487, 677 A.2d 1194 (1996), our Supreme Court addressed the issue of whether the doctrine of absolute privilege for high public officials applies to the mayor of a Pennsylvania borough. Therein, our high court stated:

> More than forth years ago in *Matson v. Margiotti*, 371 Pa. 188, 88 A.2d 892 (1952), this Court explained that the doctrine of absolute privilege for high public officials,
>
>> as its name implies, is unlimited and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction.
>
> *Matson*, 371 Pa. at 194, 88 A.2d at 895. The doctrine of absolute privilege "rests upon the * * * idea that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated

4. This is actually only a general statement of Chief McKibben's appellate issues regarding defamation and the doctrine of absolute privilege. We note that counsel for Chief McKibben has filed an extensive and well-researched brief explaining the history, rational and application of the doctrine of absolute privilege in support of *his* argument that local government officials, such as the mayor of a borough, should not be afforded absolute immunity from suit for defamation, but rather should be afforded a mere conditional privilege which permits defamation suits when statements are made with malice. Unfortunately for Chief McKibben and his counsel, our Supreme Court's recent case of *Lindner v. Mollan*, 544 Pa. 487, 677 A.2d 1194 (1996), squarely holds that the doctrine of absolute privilege applies to the mayor of a borough, and we are bound by that decision.

harm to the plaintiff's reputation." *Montgomery v. City of Philadelphia*, 392 Pa. 178, 181, 140 A.2d 100, 102 (1958). This sweeping immunity is "not for the benefit of high public officials, but for the benefit of the public." *Barto v. Felix*, 250 Pa.Super. 262, 272, 378 A.2d 927, 932 (1977) (Spaeth, J., dissenting), *appeal denied*, 487 Pa. 455, 409 A.2d 857 (1980). Absolute privilege is

> designed to protect the official from the suit itself, from the expense, publicity, and danger of defending the good faith of his public actions before the jury. And yet, beyond this lies a deeper purpose, the protection of society's interest in the unfettered discussion of public business and in full public knowledge of the facts and conduct of such business.

*Montgomery*, 392 Pa. at 183, 140 A.2d at 103.

As such, absolute immunity for high public officials from civil liability is the only legitimate "means of removing any inhibition which might deprive the public of the best service of its officers and agencies." *Id.* Even though the innocent may sometimes suffer irreparable harm,

> it has been found to be in the public interest and therefore sounder and wiser public policy to 'immunize' public officials, for to permit slander, or libel * * * suits where the official's charges turn out to be false, would be to deter all but the most courageous or the most judgment-proof public officials from performing their official duties.

*Matson*, 371 Pa. at 203, 88 A.2d at 899–900

* * *

Our cases on absolute privilege have sought to strike a balance between the public's interest in the unfettered and full discussion of public business among our government officials while recognizing the undeniable right of the individual to be protected in his or her reputation. In so doing, we have "declared that the public interest does not demand that all public officials be entitled to absolute privilege, but only that 'high-ranking officers' be so

protected." *Montgomery*, 392 Pa. at 185, 140 A.2d at 104 (quoting *Matson* ).

... The standard used to determine who qualifies as a "high public official" was set forth by this Court in *Montgomery*. *See, e.g.*, *Reese v. Danforth*, 486 Pa. 479, 406 A.2d 735, 739 (1979) (adopting *Montgomery* definition of high public official); *Jonnet v. Bodick*, 431 Pa. 59, 244 A.2d 751 (1968)(same).

In *Montgomery*, we explained that the "determination of whether a particular public officer is protected by absolute privilege should depend on the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions." *Montgomery*, 392 Pa. at 185, 140 A.2d at 105 (citing cases). This Court made clear in *Montgomery* that, absent statutory classification, the parameters establishing "high public official" status would be delineated by the judiciary on a case-by-case basis, rather than establishing a bright-line "of demarcation, if any there be, which separates offices which are protected by absolute privilege from those which are not." *Id.* Explaining that both of the city officials had policy-making functions and that the public interest demanded that public officials be encouraged to inform the community about the progress of public works paid for by the taxpayers, we concluded in *Montgomery* that the Deputy Commissioner of Public Property of Philadelphia and the Philadelphia City Architect were high public officials. *See id.*

* * *

There is no more important local public official than a mayor. He exercises the entire executive power of the borough or municipality and works closely with the city council on a wide range of social and economic policy issues. Our courts have ruled that a wide range of public officials with no greater a policy-making function than that of the Mayor in this case, and less of a policy-making function in many instances, are high public officials. *See e.g.*, *Jonnet v. Bodick*, 431 Pa. 59, 244 A.2d 751 (1968) (Township supervisor was a

high public official for purposes of absolute privilege); *Montgomery,* 392 Pa. 178, 140 A.2d 100 (1958) (Deputy Commissioner of Public Property and City Architect are high public officials); *Matson,* 371 Pa. 188, 88 A.2d 892 (1952) (Pennsylvania Attorney General is a high public official for purposes of absolute privilege); *Suppan v. Kratzer,* 660 A.2d 226 (Pa.Cmwlth.1995)(Mayor and Borough Council President were high public officials for purposes of absolute privilege); *Mosley v. Observer Publishing Co.,* 422 Pa.Super. 255, 619 A.2d 343 (1993)(County Attorney was high public official for purposes of absolute privilege), *appeal denied,* 535 Pa. 622, 629 A.2d 1382 (1993); *Factor [v. Goode],* 149 Pa.Cmwlth. 81, 612 A.2d 591 (1992)(Mayor of Philadelphia and Revenue Commissioner of Philadelphia were both high public officials), *appeal denied,* 533 Pa. 654, 624 A.2d 112 (1993); *Rok v. Flaherty,* 106 Pa.Cmwlth. 570, 527 A.2d 211 (1987)(City Comptroller was high public official for purposes of absolute privilege), *appeal denied,* 517 Pa. 628, 538 A.2d 880 (1988); *Freach v. Commonwealth,* 23 Pa. Cmwlth. 546, 354 A.2d 908 (1976)(Superintendent of the Parole Division of the Board of Probation and Parole, District Attorney and the Assistant District Attorney of Delaware County were high public officials for purposes of absolute privilege), *aff'd in part,* 471 Pa. 558, 370 A.2d 1163 (1977); *McCormick v. Specter,* 220 Pa.Super. 19, 275 A.2d 688 (1971)(District Attorney was high public official for purposes of absolute privilege.).

*Lindner,* 677 A.2d at 1195–96, 1197–1199.

As mayor of Dormont, Mayor Schmotzer routinely makes significant public policy decisions and is accountable to the voting public. Her exercise of "significant policy-making functions as the most important public official in the Borough of [Dormont, Mayor Schmotzer] clearly qualifies as a 'high public official' under the criteria established in *Montgomery* [, 140 A.2d at 105]." *Lindner,* 677 A.2d at 1199 (Mayor of Yeadon qualifies as a "high public official").

Having determined that Mayor Schmotzer qualifies as a "high public official," we must

now decide whether the doctrine of absolute privilege applies, i.e., whether her statements were made or the actions were taken in the course of her official duties or powers and within the scope of her authority. *Lindner,* 677 A.2d at 1199, *quoting Matson,* 371 Pa. at 194, 88 A.2d at 895; *see also, Montgomery,* 392 Pa. at 183, 140 A.2d at 102.

The Borough Code, 53 P.S. § 46121, sets forth the duties of the mayor in relation to the police force and, in pertinent part, provides:

The borough council may designate one of said policemen as chief of police. The mayor of the borough shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties, except that council shall fix and determine the total weekly hours of employment that shall apply to policemen.

\* \* \*

The borough may, by ordinance, establish a police department consisting of chief, captain, lieutenant, sergeants, or any other classification desired by the council, and council may, subject to the civil service provisions of this act, if they be in effect at the time, designate the individuals assigned to each office, but the mayor shall continue to direct the manner in which the persons assigned to the office shall perform their duties. The mayor may, however, delegate to the chief of police or other officers supervision over and instruction to subordinate officers in the manner of performing their duties. . . .

In addition, the Borough Code, 53 P.S. § 46124, provides that the mayor has the power, for just cause and without pay, to suspend any police officer until the succeeding regular meeting of the borough council, at which time the council may suspend, discharge, reduce in rank or reinstate with pay the officer. Finally, the mayor has the duty "[t]o preserve order in the borough, to enforce the ordinances and regulations, . . . , to exact a faithful performance of the duties of the officers appointed, and perform such oth-

er duties as shall be vested in his office by law or ordinance." 53 P.S. § 46029(1).

▮ It is clear from our review of the Borough Code that it is the primary responsibility of the mayor to supervise police force functions and control the manner in which the police perform their duties. *Slifer v. Dodge*, 26 Pa.Cmwlth. 99, 362 A.2d 471 (1976). Thus, we find that Mayor Schmotzer was engaged in the course of her duties and within the scope of her authority when she suspended Chief McKibben and issued a "News Release" regarding his suspension. She was empowered to suspend Chief McKibben, and her comments in the "News Release", although harsh and, as the jury found, untrue, were "closely related" to her duties of supervising the borough police force. As previously stated, the purpose of official immunity is to protect "society's interests in the unfettered discussion of public business" and to insure "full public knowledge of the facts and conduct of such business." *Lindner*, 677 A.2d at 1196. Accordingly, she is immune from liability with regard to Chief McKibben's *libel* claim arising from the issuance of her "News Release." *Cf.*, *Mosley*, 619 A.2d at 346–47 (district attorney's defamatory remarks to a reporter that his office had investigated plaintiff for the FBI "in order to determine if certain investment activities are above board" were closely related to his official duties and thus protected by the doctrine of absolute privilege); *McCormick*, 275 A.2d at 689 (district attorney's comments regarding an on-going investigation, although extensive, were nonetheless closely related to a matter pending within his office and, thus, within the scope of the privilege).[5]

---

5. In making our decision today, we are mindful of the comments of the United States Supreme Court in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), on the doctrine of official immunity. The Supreme Court quoted Judge Learned Hand, as follows:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed by means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him." *Gregoire v. Biddle*, 2 Cir.[1949], 177 F.2d 579, 581. *Barr v. Matteo*, *supra*, 360 U.S. at 571–72, 79 S.Ct. at 1339–40.

Then, the Court discussed the application of the doctrine of absolute privilege further, stating:

We are told that we should forbear from sanctioning any such rule of absolute privilege lest it open the door to wholesale oppression and abuses on the part of unscrupulous government officials. It is perhaps enough to say that fears of this sort have not been realized within the wide area of government where a judicially formulated absolute privilege of broad scope has long existed. It seems to us wholly chimerical to suggest that what hangs in the balance here is the maintenance of high standards of conduct among those in the public service. To be sure, as with any rule of law which attempts to reconcile fundamentally antagonistic social policies, there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good. And there are of course other sanctions than civil tort suits available to deter the executive official

However, we reach the opposite result when we consider the application of the doctrine of official immunity to Chief McKibben's *slander* claim which arose from Mayor Schmotzer's statement to the press following the dismissal of the simple assault charge for want of a *prima facie* case, wherein she told a reporter from the Pittsburgh *Post–Gazette:* "The acting chief lied. He has to wash his face in the morning and I hope he likes what he sees." Just as it was clear that Mayor Schmotzer was acting within the scope of her authority when she issued the "News Release" regarding the chief's suspension, we find it is equally clear that Mayor Schmotzer was acting well outside the course of her duties and scope of her authority when she slandered Chief McKibben outside the courtroom.

At the time of her comments, she was no more than a private citizen seeking to enforce her *private criminal complaint.* Her authority as borough mayor to offer further public comment on the matter with the protection of absolute immunity ended once the borough council reinstated Chief McKibben at their next regular meeting. As stated in the Borough Code, 53 P.S. § 46124, "[i]n any case where the counsel has reinstated a policeman, after having been suspended by the mayor, the mayor shall not thereafter suspend such policeman for reasons arising from the same act for which the first suspension was made, or for reasons which that the council, in reinstating such policeman, shall have deemed not to be grounds for suspension." Since the mayor no longer had the authority to suspend Chief McKibben for his alleged "conduct unbecoming a police officer, insubordination and assault and battery," we find that her comments following the preliminary hearing were not "closely related" to the performance of her official duties.

In making this determination, we have carefully considered the rationale for official immunity which is the protection of the public interest, not that of the government official. *See, Barr,* 360 U.S. at 570–73, 576–77,

79 S.Ct. at 1339–40, 1342; *Lindner,* 677 A.2d at 1195–96; *Mosley,* 619 A.2d at 346. Thus, "given the great potential for harm [to an individual's reputation], the privilege [of official immunity] must be limited to those statements and actions which are in fact 'closely related' to the performance of those official duties." *Mosley,* 619 A.2d at 346. We are convinced that Mayor Schmotzer's slanderous comments following the preliminary hearing are not closely related to her official duties in this case, but rather are merely those of a private citizen who was dissatisfied with the outcome of her private criminal complaint. Accordingly, we must disagree with the lower court's conclusion that Mayor McKibben may be immune from liability for *slander.*

We turn now to Mayor Schmotzer's claim that the trial court erred in permitting the jury to consider Chief McKibben's malicious prosecution action since that claim must fail as a matter of law where Judge Novak determined there was probable cause for issuance of her private criminal complaint for simple assault. As the following analysis will demonstrate, the lower court did not err in permitting the jury to decide whether Mayor Schmotzer brought her criminal action without probable cause.

A cause of action for malicious prosecution has following elements: "The defendant must have instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff." *Kelley v. Local Union 249,* 518 Pa. 517, 520–21, 544 A.2d 940, 941 (1988), *citing Miller v. Pennsylvania R.R. Co.,* 371 Pa. 308, 313, 89 A.2d 809, 811 (1952). Probable cause is defined as "a reasonable ground or suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." *Kelley,* 544 A.2d at 942, *quoting Miller,* 371 Pa. at 314, 89 A.2d at 811–12. "Usually, the existence of proba-

---

who may be prone to exercise his functions in an unworthy and irresponsible manner. We think that we should not be deterred from establishing the rule which we announce today by any such remote forebodings.

*Barr v. Matteo, supra,* 360 U.S. at 576, 79 S.Ct. at 1342.

ble cause is a question of law for the court rather than a jury question, *but may be submitted to the jury when facts material to the issue of probable cause are in controversy." Kelley,* 544 A.2d at 941 (emphasis added); *Wainauskis v. Howard Johnson Co.,* 339 Pa.Super. 266, 278–79, 488 A.2d 1117, 1123 (1985); *Turano v. Hunt,* 158 Pa. Cmwlth. 348, 352–54, 631 A.2d 822, 825 (1993), *appeal denied,* 538 Pa. 652, 647 A.2d 905 (1994).

 As previously stated, Mayor Schmotzer claims it was determined as a matter of law that the criminal prosecution of Chief McKibben was instituted with probable cause when Judge Novak, as the issuing authority, accepted the private criminal complaint for filing. Thus, she asserts there was no material questions of fact which need to be decided by the jury. We must, however, disagree, and we concur with the lower court's conclusion that "[w]hether or not Chief McKibben assaulted Mayor Schmotzer on January [5], 1993, was the subject of sharply conflicting testimony by the only two persons present at the time and place in question, Chief McKibben and Mayor Schmotzer." Opinion of March 14, 1996, p. 3.

In setting forth her argument, Mayor Schmotzer has misapprehended the determination made in the criminal proceedings against Chief McKibben. After filing of her private criminal complaint and its approval by the Commonwealth, the issuing authority, Judge Novak, was required to ascertain and certify that there was probable cause for the issuance of process in the form of an affidavit. Pa.R.Crim.P. 133; Pa.R.Crim.P. 134(a)(2).[6] In other word, Judge Novak's decision was based *solely* upon the allegation which Mayor Schmotzer set forth in her affidavit of probable cause.

Subsequently, at the preliminary hearing, Judge Novak was required to determine whether the Commonwealth established a *prima facie* case that a crime had been committed and that Chief McKibben is probably the one who committed the crime. *Commonwealth v. McBride,* 528 Pa. 153, 157–58, 595 A.2d 589, 591 (1991); *Commonwealth v.*

*Lutz,* 443 Pa.Super. 262, 264–66, 661 A.2d 405, 407 (1995). In other words, "the Commonwealth is required to present evidence of each of the material elements of the charge and to establish sufficient probable cause to warrant the belief that the accused committed the offense." *McBride,* 595 A.2d at 591, citing *Commonwealth v. Wojdak,* 502 Pa. 359, 466 A.2d 991 (1983). As we stated, in *Commonwealth v. Jury,* 431 Pa.Super. 129, 139, 636 A.2d 164, 169, *appeal denied,* 537 Pa. 647, 644 A.2d 733 (1993), "the pretrial process ... requires the application of what is known in criminal law as the probable cause standard or a *prima facie* standard." *See also, Commonwealth v. Gray,* 322 Pa.Super. 37, 469 A.2d 169 (1983), *affirmed,* 509 Pa. 476, 503 A.2d 921 (1985) (at a preliminary hearing, Commonwealth is required to establish a *prima facie* case by showing probable cause to believe that a crime has been committed and that a defendant is the offender).

Based on the evidence produced by the Commonwealth at the preliminary hearing, Judge Novak determined that a *prima facie* case had not been set forth, i.e., sufficient evidence to determine whether probable cause existed to believe that the crime of simple assault was committed and that Chief McKibben probably was the perpetrator was not presented by the Commonwealth. *See, McBride,* 595 A.2d at 592 (at the preliminary hearing, the court's sole function is to determine whether probable cause exists to require an accused to stand trial on the charges contained in the complaint). Thus, contrary to Mayor Schmotzer's claims, the proceeding in the criminal court actually resulted in a finding that *probable cause for the criminal prosecution of Chief McKibben did not exist.* Accordingly, Mayor Schmotzer had no absolute defense to claim of malicious prosecution, i.e., probable cause was not established a matter of law. *Meiksin v. Howard Hanna Co., Inc.,* 404 Pa.Super. 417, 420, 590 A.2d 1303, 1305, *appeal denied* 528 Pa. 644, 600 A.2d 196 (1991) ("If probable cause is shown to have existed, an absolute defense is established against an action for malicious prose-

---

6. These rules were renumbered as Pa.R.Crim.P. 106 and Pa.R.Crim.P. 108, in 1994, subsequent to the filing and dismissal of Mayor Schmotzer's private criminal complaint.

cution, even when express malice is proved.").

■ Mayor Schmotzer would have this court accept her mere allegations in her affidavit of probable cause as conclusive proof of probable cause. This we will not do, given the fact the Judge Novak, after the preliminary hearing, actually concluded that probable cause was lacking. Further, in light of the litigant's diametrically opposed versions of the events of January 5, 1993, we find the lower court did not err when it submitted the question of whether Mayor Schmotzer instituted her private criminal action without probable cause to the jury. *Cf., Cap v. K-Mart Discount Stores, Inc.*, 357 Pa.Super. 9, 515 A.2d 52 (1986) (case remanded for trial where question of probable cause should have been submitted to the jury; fact that plaintiff had been convicted on charge of theft of services by district magistrate was not conclusive proof of probable cause since plaintiff was later found not guilty after his trial *de novo* before the Court of Common Pleas); *Wainauskis, supra* (issue of probable cause was properly sent to jury where criminal proceedings against plaintiff were bound over for trial after a preliminary hearing on the basis of an "inadequate or unreasonable investigation" and plaintiff's first trial resulted in a mistrial and her second trial resulted in an acquittal); *compare, Kelley*, 544 A.2d at 942–43 (issue of probable cause should not have been presented to jury where upon review of the *undisputed material facts*, prior criminal prosecution was based upon probable cause).

To summarize our conclusions thusfar, Mayor Schmotzer is a "high public official" and she is entitled to an absolute privilege in relation to her issuance of the "News Release" since her actions related thereto fell within the course of her official duties and the scope of her authority. Accordingly, the lower court erred when it refused to dismiss Chief McKibben's *libel* claim. Second, we reach the opposite result in relation to her hearing and conclude that Mayor Schmotzer was not acting within the scope of her authority when she made those statements. Consequently, she is not entitled to an absolute defense to Chief McKibben's *slander* cause of action, and the lower court correctly

permitted that claim to go before the jury. Finally, we find that the lower court did not err when it permitted the jury to determine whether Mayor Schmotzer instituted her private criminal action against the chief without probable cause.

■ Our inquiry does not end here. As previously stated, the lower court ruled that a new trial as to all counts of the complaint was necessary because the issues related to each were "inextricably intertwined". For the following reasons, we must disagree that a new trial is warranted as to Mayor Schmotzer's liability for malicious prosecution and slander. Those counts were properly before the jury, and, in response to interrogatories, the jury, *inter alia*, expressly found: 1) Mayor Schmotzer initiated criminal proceedings against Chief McKibben with malice and without probable cause; 2) The statements made by Mayor Schmotzer about Chief McKibben following his preliminary hearing on April 23, 1993, were not true; and 3) The statements made by Mayor Schmotzer about Chief McKibben following his preliminary hearing on April 23, 1993, were made with malice. Thus, there is no need for a new trial as to liability on those claims.

However, the jury was not asked to award a specific amount of damages on each separate count of the complaint. Rather, the jury made a general award of damages to Chief McKibben in the amount of $50,000 in compensatory and $30,000 in punitive damages. Since the damages award did not distinguish the amount of damages which were awarded for each specific count of the complaint, we cannot determine how much of that award was based upon the chief's *libel* claim. Accordingly, a new trial must be held on the issue of *damages* alone on the remaining claims.

Order awarding a new trial is reversed. Case remanded for proceedings in accordance with the provisions of this opinion. Jurisdiction relinquished.

DEL SOLE, J., did not participate in the consideration or decision of this case.